# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

**FILED**

Mar 30 2022

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COVER SHEET

**_Instructions:_** _Effective November 1, 2016, this Criminal Cover Sheet must be completed and submitted, along with the Defendant Information Form, for each new criminal case._

CASE NAME:
**USA V. STEPHEN SILVERMAN**

CASE NUMBER: **CR 18-533 RS**

| | | | |
|---|---|---|---|
| This Case Under Seal? | Yes | No ✔ | |
| Total Number of Defendants: | 1 ✔ | 2-7 | 8 or more |
| Does this case involve ONLY charges under 8 U.S.C. § 1325 and/or 1326? | Yes | No ✔ | |
| Venue (Per Crim. L.R. 18-1): | SF ✔ | OAK | SJ |
| Is this a potential high-cost case? | Yes | No ✔ | |
| Is any defendant charged with a death-penalty-eligible crime? | Yes | No ✔ | |
| Is this a RICO Act gang case? | Yes | No ✔ | |

Assigned AUSA
(Lead Attorney): **Alexandra Shepard**

Date Submitted: 03/30/2022

Comments:

RESET FORM      SAVE PDF

# United States District Court

## FOR THE
### NORTHERN DISTRICT OF CALIFORNIA

## VENUE:  SAN FRANCISCO

**FILED**

Mar 30 2022

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

---

UNITED STATES OF AMERICA,

V.

STEPHEN SILVERMAN

DEFENDANT(S).

---

# SECOND SUPERSEDING INDICTMENT

18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud;
18 U.S.C. § 1956(h) – Conspiracy to Commit Laundering of Monetary Instruments;
18 U.S.C. § 371 – Conspiracy to Engage in the Unlawful Wholesale Distribution of Drugs;
18 U.S.C. § 2 – Aiding and Abetting;
18 U.S.C. §§ 981, 982, 21 U.S.C. § 853 & 28 U.S.C. § 2461(c) – Criminal Forfeiture

A true bill.

_____/S/ Foreperson of the Grand Jury_____

Foreman

Filed in open court this ____30th____ day of

March, 2022 _____.

_____   Clerk

Chief Magistrate Judge Joseph C. Spero

Bail, $ NO PROCESS

STEPHANIE M. HINDS (CABN 154284)
United States Attorney

<div style="border:1px solid">

# FILED

Mar 30 2022

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

</div>

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 18-533 RS |
| Plaintiff, | |
| v. | <u>VIOLATIONS</u>: 18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud; 18 U.S.C. § 1956(h) – Conspiracy to Commit Laundering of Monetary Instruments; 18 U.S.C. § 371 – Conspiracy to Engage in the Unlawful Wholesale Distribution of Drugs; 18 U.S.C. § 2 – Aiding and Abetting; 18 U.S.C. §§ 981, 982, 21 U.S.C. § 853 & 28 U.S.C. § 2461(c) – Criminal Forfeiture |
| STEPHEN SILVERMAN | |
| Defendant. | |
| | SAN FRANCISCO VENUE |

S E C O N D   S U P E R S E D I N G   I N D I C T M E N T

The Grand Jury charges:

<u>Introductory Allegations</u>

At times relevant to this Indictment:

<u>Overview of the Regulation of the Distribution of Prescription Drugs</u>

1.      The Food and Drug Administration ("FDA") was the federal agency of the United States responsible for administering federal statutes and regulations aimed at protecting the health and safety of United States citizens and residents by ensuring that, among other things, drugs were safe and effective for their intended uses and that the labeling of such drugs bore true, complete, and accurate information before they may be offered and sold in the United States.

SECOND SUPERSEDING INDICTMENT                    1

2.       The FDA enforced the Federal Food, Drug and Cosmetic Act ("FDCA"), as amended by the Drug Supply Chain and Security Act ("DSCSA"), which, among other things, was designed to ensure that drugs sold for human use were safe and effective for their intended uses.

3.       The FDCA defined a "drug" as: (A) articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any articles specified in clause (A), (B), or (C).

4.       A "prescription drug" was any drug "intended for use by man" which, "(A) because of its toxicity or other potentiality for harmful effects, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drugs," or any drug which "(B) is limited by an approved [new drug] application . . . to use under the professional supervision of a practitioner licensed by law to administer such drug."  21 U.S.C. §353(b)(1).

5.       On November 27, 2013, the DSCSA was enacted to better protect the integrity of the nation's drug distribution system.  One of the intended results of the DSCSA was to prevent the practice known as prescription drug diversion.   Under the DSCSA:

a)       "Wholesale Distribution" meant distribution of a prescription drug to or receipt of a prescription drug by a person other than a consumer or patient, but does not include the lawful dispensing of a prescription drug pursuant to a prescription according to 21 U.S.C. §353(b)(1).

b)       A "wholesale distributor" of prescription drugs meant a person (other than the manufacturer, a manufacturer's co- licensed partner, a third party logistics provider, or repackager) engaged in wholesale distribution.

c)       "Authorized" in the case of a wholesale distributor meant having a valid license under State law or 21 U.S.C. § 360eee-2, in accordance with 21 U.S.C. §360eee-1(a)(6).

d)       "Licensed," in the case of a wholesale distributor, meant having a valid license in

accordance under 21 U.S.C. §353(e) or State law.

e)      "Transaction history" meant a statement in paper or electronic form that includes the transaction information for each prior transaction going back to the manufacturer of the drug product.

f)      "Transaction information" included, among other things, the strength and dosage form of the drug product, the number of containers, the lot number of the drug product, and the business name and address of the persons from whom and to whom ownership is being transferred.

g)      "Transaction statement" meant a statement in paper or electronic form that the entity transferring ownership of a drug product is in compliance with certain provisions of the DSCSA.

6.      Effective January 1, 2015, the FDCA, as amended by the DSCSA, imposed requirements on wholesale distributors of most prescription drugs, including certain product tracing requirements. Specifically:

a)      A wholesale distributor was prohibited from accepting ownership of a product unless the previous owner prior to, or at the time of, the transaction provided the transaction history, transaction information, and a transaction statement for the product.

b)      The trading partners of a wholesale distributor may only be authorized trading partners.

7.      If a wholesale distributor purchased a product directly from the manufacturer, the exclusive distributor of the manufacturer, or a repackager that purchased directly from the manufacturer, then prior to, or at the time of, each transaction in which the wholesale distributor transferred ownership of a product, the wholesale distributor was required to provide to the subsequent purchaser—

a)      a transaction statement, which was required to state that such wholesale distributor, or a member of the affiliate of such wholesale distributor, purchased the product directly from the manufacturer, exclusive distributor of the manufacturer, or repackager that purchased the product directly from the manufacturer; and

b)      the transaction history and transaction information.

8.     Wholesale distributors of prescription drugs who did not purchase a prescription drug directly from the manufacturer, the exclusive distributor of the manufacturer, or a repackager directly from the manufacturer must have, prior to or at the time of each transaction, provided to the subsequent purchaser a transaction history, transaction information, and transaction statement.  Wholesale distributors were required to capture the transaction information (including lot level information), transaction history, and transaction statements for each transaction described above, and maintain that information, history and statement for not less than six years after the date of the transaction.

### The Co-Conspirators and Related Entities

9.     Edvin OVASAPYAN was the owner and operator of Mainspring Distribution, a Pennsylvania limited liability company.  OVASAPYAN resided in the State of California.

10.     Mainspring Distribution ("Mainspring") was a Pennsylvania corporate entity that has been licensed by the Commonwealth of Pennsylvania as a wholesale pharmaceutical distributor.

11.     Hakob KOJOYAN resided in the State of California.

12.     Lorik PAPYAN resided in the State of California.

13.     Defendant Stephen SILVERMAN resided in the State of California.  SILVERMAN was an attorney licensed to practice law in the State of California.

### The Conspiracy and Scheme to Defraud

14.     Beginning at a date unknown to the grand jury, but no later than on or about August 20, 2015, and continuing through a date unknown to the grand jury, but to at least on or about March 25, 2019, OVASAPYAN, KOJOYAN, PAPYAN, and SILVERMAN knowingly devised, intended to devise, and carried out a conspiracy and scheme and artifice to defraud as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts and omissions of material facts with a duty to disclose.

As part of the conspiracy and scheme to defraud:

15.     OVASAPYAN, through his control of Mainspring and via other means, including impersonating the identity of licensed suppliers, sold or arranged to be sold large quantities of prescription drugs to retail pharmacies and wholesalers across the United States.  OVASAPYAN and his coconspirators specialized in the distribution of various prescription drugs used to treat the Human

Immunodeficiency Virus ("HIV").  OVASAPYAN, KOJOYAN, PAPYAN, and others known and unknown to the Grand Jury generated false and misleading documentation claiming that the HIV drugs they sold, including through Mainspring, had been acquired in compliance with federal law from authorized trading partners who were licensed, legitimate suppliers.

16.     Prior to creating Mainspring, OVASAPYAN and his coconspirators created records falsely suggesting that their operation was licensed.  More specifically, they stole the identity of a licensed prescription drug wholesaler (hereinafter, the "FIRST LICENSED SUPPLIER") in order to create the false impression that their operations were legitimate.

17.     Once Mainspring was operational, OVASAPYAN, KOJOYAN, PAPYAN, and their coconspirators identified a second licensed wholesaler in California (hereinafter, the SECOND LICENSED SUPPLIER) and then created paperwork falsely representing that Mainspring's supply of prescription drugs had been acquired from the SECOND LICENSED SUPPLIER.  In reality, Mainspring had never acquired any prescription drugs from the SECOND LICENSED SUPPLIER, and the drugs sold under that name had in fact been acquired from unlicensed sources on the black market.

18.     In particular, when Mainspring sold prescription drugs to its customers, it provided those customers with documentation purporting to be the required transaction information, transaction statements, and transaction histories (collectively, "Transaction Documentation").  Provision of such documentation was required by the DSCSA.  Since on or about February 2017, and continuing through approximately November 2018, the vast majority of the Transaction Documentation for Mainspring's sales, prepared in connection with certain transactions, represented that a particular supplier (hereinafter, "SUPPLIER ONE"), was the source from which Mainspring had acquired the drug.  That Transaction Documentation was materially false and misleading.

19.     The listed name for SUPPLIER ONE on the Transaction Documentation prepared in connection with certain transactions was misleadingly similar to the name of the SECOND LICENSED SUPPLIER, and it created the false impression that the prescription drugs in question had, in fact, been supplied by the SECOND LICENSED SUPPLIER.  The Transaction Documentation buttressed this false impression by also listing the SECOND LICENSED SUPPLIER's business address in the State of California.  Customers reviewing the Transaction Documentation purporting to identify the source of the

SECOND SUPERSEDING INDICTMENT          3

prescription drugs would therefore see a name confusingly similar to the SECOND LICENSED SUPPLIER, in addition to the business address for the SECOND LICENSED SUPPLIER.  In reality, the vast majority of the prescription drugs sold by Mainspring were acquired from other sources that were never disclosed to customers or reflected in the Transaction Documentation.  In most instances, these prescription drugs were unlawfully acquired from unlicensed individuals operating in the State of California.

20.     OVASAPYAN, KOJOYAN, and PAPYAN communicated frequently during the course of the conspiracy, and KOJOYAN and PAPYAN knowingly participated in the scheme to mislead customers into believing that Mainspring's supply of prescription drugs was legitimate.  KOJOYAN and OVASAPYAN monitored the licensure status for the SECOND LICENSED SUPPLIER, and in the event the license for the SECOND LICENSED SUPPLIER became inactive, OVASAPYAN and KOJOYAN would cease sales activity until the license was reactivated.

21.     As a further part of the conspiracy and the scheme to defraud, OVASAPYAN, KOJOYAN, and others established and caused to be established shell companies with names deceptively similar to the SECOND LICENSED SUPPLIER.  OVASAPYAN and KOJOYAN then established and caused to be established bank accounts held in those deceptively similar corporate names.  In order to conceal the fraud, OVASAPYAN and KOJOYAN arranged for Mainspring to transfer funds to these deceptively named accounts in order to create banking records superficially consistent with financial transfers to a legitimate, SECOND LICENSED SUPPLIER.  However, Mainspring never transferred any funds to any bank account controlled by the SECOND LICENSED SUPPLIER, and it otherwise never did any business with the SECOND LICENSED SUPPLIER.  In reality, the funds transferred from Mainspring to the accounts established by KOJOYAN and others were often liquidated and returned as proceeds to the coconspirators, or else transferred to other bank accounts.  Only a very small portion of the funds acquired by Mainspring from its customers was ever sent to licensed prescription drug wholesalers.  Over the course of the scheme, Mainspring was paid more than $70,000,000 by its customers.

22.     SILVERMAN was member of the scheme and he joined the conspiracy knowing its illicit nature and intending to help further the conspiracy.  Beginning prior to Mainspring's operation, when

1    OVASAPYAN and his co-conspirators used similar means to further their fraudulent scheme,

2    SILVERMAN used bank accounts under his control to launder the proceeds of OVASAPYAN's

3    scheme.  In that same period, he assisted OVASAPYAN in generating false documents to quell concerns

4    raised by certain of OVASAPYAN's customers.  SILVERMAN and OVASPAYAN communicated

5    frequently via email and other means, and SILVERMAN agreed to and did ghostwrite communications

6    in furtherance of the scheme at OVASAPYAN's request.  SILVERMAN assisted in financing the

7    scheme in its early stages, obtained necessary licenses to further the scheme, established or caused to be

8    established corporate entities and associated bank accounts, and received a portion of the profits once

9    the scheme was operational.

10        23.    As a further part of the conspiracy and the scheme to defraud, PAPYAN and

11    SILVERMAN sought to continue the scheme to defraud after Mainspring ceased operations in or about

12    November 2018.  PAPYAN, SILVERMAN, and others known and unknown to the Grand Jury,

13    participated in negotiations and preliminary steps in early 2019 to use a licensed prescription drug

14    wholesaler in the State of Washington to distribute large quantities of diverted prescription drugs.

15    PAPYAN took steps to generate misleading business records regarding the new drug wholesaler and

16    acquired a large supply of diverted prescription drugs to be distributed via that wholesaler.  With

17    knowledge of the scheme, SILVERMAN offered advice regarding avoiding detection by law

18    enforcement and assisted his coconspirators with acquiring certain state licenses to further the scheme.

19        24.    In the course of the conspiracy, the coconspirators caused email messages to be sent from

20    individuals in and around Los Angeles, California, to an unwitting Mainspring employee working in

21    Pennsylvania.  The coconspirators also caused various financial transfers, representing payments made

22    by customers to Mainspring in exchange for prescription drugs, to be made between customers in

23    various states, such as New York, and the Mainspring bank account, which was controlled from in and

24    around Los Angeles, California.

25    COUNT ONE:        (18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud)

26        25.    Paragraphs 1 through 22 of this Indictment are re-alleged and incorporated as if fully set

27    forth here.

28        26.    Beginning on a date unknown, no later than on or about August 20, 2015, and continuing

SECOND SUPERSEDING INDICTMENT         5

to a date unknown, but through at least on or about March 25, 2019, in the Northern District of California and elsewhere, the defendant,

STEPHEN SILVERMAN

and others known and unknown did knowingly conspire to devise and intend to devise a scheme and artifice to defraud as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts and omissions of material facts with a duty to disclose, and, for the purpose of executing such scheme and artifice to defraud, to transmit and cause the transmission of wire communications in interstate commerce, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1349.

COUNT TWO:          (18 U.S.C. § 1956(h) – Conspiracy to Commit Laundering of Monetary Instruments)

27.     Paragraphs 1 through 24 of this Indictment are re-alleged and incorporated as if fully set forth here.

28.     Beginning at a date unknown to the grand jury, but no later than on or about August 20, 2015, and continuing to a date unknown to the grand jury, but to at least on or about March 25, 2019, in the Northern District of California and elsewhere, the defendant,

STEPHEN SILVERMAN

and others known and unknown, unlawfully and knowingly conspired together and with one another to violate Title 18, United States Code, Section 1956(a)(1).

29.     It was a part and an object of the conspiracy that the defendant, and others known and unknown to the grand jury, with the intent to promote the carrying on of specified unlawful activity and to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, to wit, conspiracy to commit wire fraud in violation of Title 18, United States Code, Section 1349, unlawfully and knowingly, and knowing that property involved in a financial transaction represents the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct financial transactions which in fact involved the proceeds of specified unlawful activity, in

violation of Title 18, United States Code, Section 1956(a)(1).

All in violation of Title 18, United States Code, Section 1956(h).

COUNT THREE:          (18 U.S.C. § 371 – Conspiracy to Engage in the Unlawful Wholesale
                      Distribution of Drugs)

30.     Paragraphs 1 through 27 of this Indictment are re-alleged and incorporated as if fully set forth here.

31.     Beginning at a date unknown to the grand jury, but no later than on or about August 20, 2015, and continuing to a date unknown to the grand jury, but to at least on or about March 25, 2019, in the Northern District of California and elsewhere, the defendant,

STEPHEN SILVERMAN

and others known and unknown, did knowingly and intentionally conspire to:

a)      knowingly engage in the unlicensed wholesale distribution of prescription drugs in interstate commerce, in violation of Title 21, United States Code, Sections 331(t), 353(e)(1)(A), 333(b)(1)(D);

b)      engage in the wholesale distribution of prescription drugs without obtaining and providing truthful and accurate transaction histories, transaction statements, and transaction information, with intent to defraud and mislead, in violation of Title 21, United States Code, Sections 331(t), 360eee-1(c), and 333(a)(2); and

c)      defraud the United States and its agencies by impeding, impairing, and defeating the lawful functions of the Food and Drug Administration to protect the health and safety of the public by ensuring that prescription drugs distributed in the United States were safe and effective from the time of manufacturing to the delivery to the entity that sells or dispenses the product to the ultimate consumer or patient.

Overt Acts

32.     In furtherance of the conspiracy, and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Northern District of California and elsewhere:

a)      On or about March 16, 2018, $42,000 was transferred from an account held in the

SECOND SUPERSEDING INDICTMENT          7

name of Mainspring Distribution to an account held in the name of an entity domiciled in San Mateo, California.

b)      On or about April 5, 2018, $15,000 was transferred from an account held in the name of Mainspring Distribution to an account held in the name of an entity domiciled in San Mateo, California.

c)      In or about January 2016, SILVERMAN drafted false and misleading correspondence designed to quell concerns raised by one of the conspiracy's customers.

d)      On or about September 26, 2017, the co-conspirators caused Transaction Documentation to be generated for a customer that falsely and fraudulently misrepresented the source of prescription drug products.

e)      On or about March 25, 2019, a quantity of diverted prescription drugs was delivered to an address in North Hollywood, California, with the intent that they be shipped to a prescription drug wholesale distributor in the State of Washington.

All in violation of Title 18, United States Code, Section 371.

FORFEITURE ALLEGATION:        (18 U.S.C. §§ 981, 982, 21 U.S.C. § 853 & 28 U.S.C. § 2461(c) –
                              Criminal Forfeiture)

33.      All of the allegations contained in this Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Sections 981 and 982, Title 21, United States Code, Section § 853, and Title 28, United States Code, Section 2461(c).

34.      Upon a conviction for any offense alleged in Count One of this Indictment, the defendant,

STEPHEN SILVERMAN

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property, real or personal, constituting or derived from proceeds defendant obtained directly and indirectly as the result of the violation, including but not limited to a forfeiture money judgment.

35.      Upon a conviction for any offense alleged in Count Two of this Indictment, the defendant,

STEPHEN SILVERMAN

SECOND SUPERSEDING INDICTMENT              8

1   shall forfeit to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), 982(a), and 28 U.S.C.

2   § 2461(c), all property, real or personal, involved in or traceable to the violation, or constituting or

3   derived from proceeds traceable directly and indirectly to a violation, including but not limited to a

4   forfeiture money judgment.

5       36.     Upon a conviction for any offense alleged in Count Three of this Indictment, the

6   defendant,

                             STEPHEN SILVERMAN

7   shall forfeit to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(7), and 28 U.S.C.

8   § 2461(c), all property, real or personal, that constitutes or is derived, directly or indirectly, from the

9   gross proceeds traceable to the commission of the offense, including but not limited to a forfeiture

10  money judgment.

11      37.     If any of the aforementioned property, as a result of any act or omission of the

12  defendant –

13          a.     cannot be located upon the exercise of due diligence;

14          b.     has been transferred or sold to, or deposited with, a third person;

15          c.     has been placed beyond the jurisdiction of the Court;

16          d.     has been substantially diminished in value; or

17          e.     has been commingled with other property that cannot be divided without

18                 difficulty;

19  any and all interest the defendant has in other property shall be vested in the United States and

20  forfeited to the United States pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982 and

21  United States Code, Section 2461(c).

22      All in violation of Title 18, United States Code, Sections 981 and 982; Title 21, United States

23  Code, Section § 853; Title 28, United States Code, Section 2461(c); and Rule 32.2 of the Federal Rules

24  //

25  //

26  //

27  //

28

SECOND SUPERSEDING INDICTMENT            9

1    of Criminal Procedure.

2    DATED: 3/30/2022                                         A TRUE BILL

3

4                                                         _____/s/_____
                                                          FOREPERSON

5    STEPHANIE M. HINDS
     United States Attorney
6

7    _____/s/_____
     ALEXANDRA SHEPARD
8    ANDREW F. DAWSON
     Assistant United States Attorneys
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND SUPERSEDING INDICTMENT                    10

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☒ INDICTMENT

☒ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

### OFFENSE CHARGED

Ct 1: 18 U.S.C. 1349 - Conspiracy to Commit Wire Fraud
Ct 2: 18 U.S.C. 1956(h) - Money Laundering Conspiracy
Ct 3: 18 U.S.C. 371 - Conspiracy to Engage in the
Unlawful Wholesale Distribution of Drugs

☐ Petty
☐ Minor
☐ Misde-
    meanor
☒ Felony

PENALTY:    See Attachment

### DEFENDANT - U.S

STEPHEN SILVERMAN

DISTRICT COURT NUMBER

CR 18-533

**FILED**

Mar 30 2022

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)
Federal Bureau of Investigation

☐ person is awaiting trial in another Federal or State Court,
give name of court

☐ this person/proceeding is transferred from another district
per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of
charges previously dismissed
which were dismissed on motion
of:                                      SHOW
                                         DOCKET NO.
   ☐ U.S. ATTORNEY   ☐ DEFENSE

☐ this prosecution relates to a
pending case involving this same
defendant                                MAGISTRATE
                                         CASE NO.

☐ prior proceedings or appearance(s)
before U.S. Magistrate regarding this
defendant were recorded under

Name and Office of Person
Furnishing Information on this form          STEPHANIE M. HINDS

☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)          Alexandra Shepard

### DEFENDANT

**IS *NOT* IN CUSTODY**

1) ☒ Has not been arrested, pending outcome this proceeding.
     If not detained give date any prior
     summons was served on above charges

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction         ☐ Federal  ☐ State

6) ☐ Awaiting trial on other charges
     If answer to (6) is "Yes", show name of institution

Has detainer   ☐ Yes    If "Yes"
been filed?    ☐ No      give date
                         filed

**DATE OF
ARREST**                Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED
TO U.S. CUSTODY**       Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS  ☒ NO PROCESS*  ☐ WARRANT        Bail Amount:

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance

Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or
warrant needed, since Magistrate has scheduled arraignment*

Date/Time:                          Before Judge:

Comments:

**Attachment A to AO 91**

**UNITED STATES v. STEPHEN SILVERMAN**

| Count 1: 18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud |
|---|

Maximum Penalties:
      20 years in prison
      $250,000 fine, or twice the gross gain or loss
      3 years' supervised release
      $100 special assessment
      Forfeiture
      Potential deportation

| Count 2: 18 U.S.C. § 1956(h) – Conspiracy to Commit Money Laundering |
|---|

Maximum Penalties:
      20 years in prison
      $500,000 fine or twice the value of the property involved in the transaction
      3 years' supervised release
      $100 special assessment
      Forfeiture
      Potential deportation

| Count 3: 18 U.S.C. § 371 – Conspiracy to Engage in the Unlawful Wholesale Distribution of Drugs |
|---|

Maximum Penalties:
      5 years in prison
      $250,000 fine or twice the value of the property involved in the transaction
      3 years' supervised release
      $100 special assessment
      Forfeiture
      Potential Deportation