1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

STEPHEN SILVERMAN,

Defendant.

Case No. 18-cr-00533-RS-4

**ORDER ON FORFEITURE**

On April 2, 2024, the Government's forfeiture request of $1,197,897.34 was granted. The Government calculated this sum based on the amount of tainted funds that flowed from Mainspring Distribution ($976,544.73), Covidien Sales ($182,910.09), and co-conspirator Edvin Ovasapyan ($38,442.52) to Defendant Stephen Silverman's personal bank accounts. The Government did not seek forfeiture of other tainted funds that passed through client trust accounts and were "not exclusively used for Silverman's personal benefit." Dkt. 281, at 9. Forfeiture in the amount of $1,197,897.34—a small fraction of the conspiracy's total proceeds—is appropriate for the reasons articulated below.

In two rounds of briefing, Silverman pointed to *United States v. Thompson*, 990 F.3d 680 (9th Cir. 2021), in arguing the proper forfeiture amount should be far less that what the Government requested. In that case, the Ninth Circuit explained a proper forfeiture analysis requires a finding "that the amount forfeited came to rest with [the defendant] as a result of his crimes." *Id.* at 690–91. It is not enough, in other words, to find a conspirator, at some point, had physical control over conspiracy proceeds. *Id.* at 691. The central problem in *Thompson* was that

the district court held one co-conspirator responsible for "the whole amount of the proceeds from the conspiracy, despite the fact that some of the proceeds came to rest" with a co-conspirator. *Id.* at 690. *Thompson* was careful to distinguish situations in which co-conspirators control joint bank accounts and "each have an unfettered right to enjoy the whole" (such that forfeiture might be appropriate) from situations in which bank accounts are "stops on the way" to splitting up loot. *Id.* The fact that multiple individuals might be able to draw from a joint account does not insulate an account owner from forfeiture.

Here, the Government estimated Mainspring earned between $50 and $70 million from the pharmaceutical drug distribution conspiracy, and Silverman did not contest the accuracy of this estimate. The Government did not seek forfeiture of the total proceeds of the conspiracy from Silverman, but instead sought forfeiture only of those funds deposited into Silverman's personal bank accounts. This fact alone distinguishes this case from *Thompson*, where the individual conspirators were ordered to forfeit *all* of the conspiracy's proceeds. The Government has independently sought forfeiture of Ovasapyan's proceeds from the conspiracy, including "$2 million in funds" and the "sales proceeds of multiple real properties." Dkt. 276, at 21. The forfeiture sought from Ovasapyan and Silverman are tied to the tainted proceeds they independently received.

Silverman, moreover, controlled both bank accounts into which the $1,197,897.34 was deposited and used these accounts for personal expenditures. Silverman's argument he was just the conspiracy's banker and never took "ownership" of the "deposits" he received, *see* Dkt. 283, at 3, is contradicted by the evidence and not credible. For instance, Silverman received checks totaling $85,000.00 from Mainspring on April 5 and April 19, 2017, and paid the same $85,000.00 in taxes in his own name to the IRS on April 17, 2017. Similarly, Silverman transferred nearly $420,000.00 to a Stubbs Alderton, a law firm, via two checks referencing investments in PackIt, a company in which Silverman was already a part owner just two days after receiving a $420,000.00 deposit from Mainspring. The Government met its burden to show, by a preponderance of the evidence, that the $1,197,897.34 that flowed into Silverman's *personal accounts* came to rest with

United States District Court
Northern District of California

him as required under *Thompson*.

Nevertheless, Silverman contends the Government was required to go further and perform a "transaction-by-transaction" analysis to support its forfeiture request. Dkt. 283, at 4. He also claims forfeiture is appropriate only where tainted funds were deposited into Silverman's accounts and then were spent in a way that benefitted Silverman specifically. No authority supports either proposition. *Thompson* explicitly distinguished situations in which tainted funds are deposited into a joint bank account to which multiple conspirators have access. *See* 990 F.3d at 691. Though Silverman may have given other people, including Ovasapyan, access to Amex cards Silverman paid for out of his personal accounts, this does not insulate funds to which Silverman had an equal right of access from forfeiture. For similar reasons, the $156,242.00 Silverman wired to pay for a Mercedes as part of a "joint venture" with Ovasapyan is not money that came to rest with Ovasapyan merely because Ovasapyan might have also benefitted from this venture. *See* Dkt. 281, at 2. The Government met its burden to show Silverman had at least an equal right to the funds in his accounts, and Silverman did not rebut this showing by pointing to evidence that Silverman's accounts were simply way stations for the funds prior to some further distribution.

**IT IS SO ORDERED**.

Dated: April 3, 2024

RICHARD SEEBORG
Chief United States District Judge

United States District Court
Northern District of California